**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:23-cr-00591 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | |
| | ) | |
| KEVIN MORRIS, | ) | |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |

Defendant Kevin Morris moved the Court to suppress evidence seized from the basement of 4105 E. 64th Street, Cleveland, Ohio, during a search conducted pursuant to a warrant, and his subsequent statements to law enforcement officers. (R. 20). The Government filed a response opposing the motion. (R. 22). Defendant filed a reply and requested a hearing. (R. 23). The Court conducted an evidentiary hearing, followed by argument from counsel. For the following reasons, the motion is denied.

**I. Facts**

On October 12, 2023, Drug Enforcement Administration (DEA) investigators, including Special Agent Jonathan Fraser, (R. 22-5), surveilled 4105 E. 64th Street, Cleveland, Ohio. (R. 20-2, PageID# 125, ¶ 19; R. 22-5, PageID# 172, ¶ 2). That residence "appeared to be a duplex with an upper and lower level." (R. 22-5, PageID# 172, ¶ 2). During their surveillance, DEA investigators saw Defendant exit the residence's back door holding a trash bag and "dispose of" the trash bag by putting it in a trashcan in front of a neighboring house. (R. 20-2, PageID# 125, ¶

20). Investigators retrieved the trash bag and found "multiple vacuum[-]sealed bags," which field-tested positive for fentanyl and amphetamines. (*Id.* at PageID# 125–26, ¶¶ 21–23).

Later that day, DEA Task Force Officer Adam Anderson applied for a warrant to search "4105 E. 64th Street, Downstairs, Cleveland, Ohio." (R. 22-1). He specified that the search was for "4105 E. 64th Street, Downstairs," because that was how the address was marked on Defendant's driver's license. (*See* Suppression Hr'g Tr. 7, 25). Officer Anderson's affidavit indicated that this address was "where [Defendant] state[d] he [wa]s staying with his parents" and was "listed as [Defendant]'s address in law enforcement databases." (R. 20-2, PageID# 125, ¶ 19). Officer Anderson's first attachment to the search warrant application describes the "Property to Be Searched" as "The residence, curtilage, outbuildings located at 4105 E. 64th Street, Downstairs, Cleveland, Ohio 44105 (TARGET RESIDENCE). The TARGET RESIDENCE is further described as a two-story residential house with off white siding with red at the peak of the residence. Access to the lower unit, at the rear of the residence, further described as a white door, the door which investigators observed MORRIS walk out of with the trash." (R. 22-2, PageID# 159).[1] A magistrate judge approved the application and issued a search warrant for "4105 E. 64th Street, Downstairs, Cleveland, Ohio." (R. 20-1).

Officer Anderson held a "presearch warrant briefing." (Suppression Hr'g Tr. 10). He had executed search warrants on close to one hundred houses, (*id.* at 16), and he knew that buildings with multiple residences have areas "that can be common to all the residents," (*id.* at 35–36). He instructed officers to "let [him] know" if "there was any indication that the house was separated by units." (*Id.* at 10–11). That way, he could ensure officers "stayed within the warrant[,] and if

---

[1] When executing the search warrant, officers learned that the house's front door "didn't work and wasn't used." (Suppression Hr'g Tr. 32).

[they] saw anything outside of" the warrant's scope "or that [they] felt would have divided th[e] house any other way," they could "stop[] and appl[y] for another search warrant." *Id.* He gave this instruction because in Cleveland, "it's very common" for single-family homes to be subdivided into multiple residences—in fact, officers "run into this all the time." (*Id.* at 11). Additionally, Defendant's driver's license and criminal history specified that his address was "4105 E. 64th Street, Downstairs," *see id.*, and normally, when an address includes "downstairs," "that's an indication that there's another residence upstairs," (*id.* at 26).

After the briefing, officers executed the warrant. (*Id.* at 11). When officers knocked on the exterior rear door of the residence, no one answered, so they "forced entry into the residence." (R. 20-3, PageID# 134, ¶ 30). Inside that exterior door was a small vestibule. (*See* Suppression Hr'g Tr. 12; *see also* R. 22-6). In the vestibule, to the left, there was a set of stairs going up to the second floor. (Suppression Hr'g Tr. 12–13; *see also* R. 22-6). There were also two doors next to those stairs: one door leading to stairs descending to the basement and one next to it that led to a living area on the first floor. (Suppression Hr'g Tr. 12–13; R. 22-6). When officers forced entry through the exterior door, the interior door leading to the first-floor living area was open, and the people inside tried to close the door. (Suppression Hr'g Tr. 30–31, 33–34).

Officers conducted a protective sweep of the entire residential house, detaining the occupants, except Defendant who was not initially present; bringing them outside; and clearing the first and second floors and basement. (*Id.* at 13, 24, 33). Officers found that the open interior door to the first-floor living area had a handle that locked and a deadbolt. (*Id.* at 30–31, 33–34). Body camera footage shows that the first-floor living area was comprised of two bedrooms, a kitchen, a bathroom, and a living room. (*See also id.* at 26, 34–35). Taking the stairs up to the

3

second floor, officers found another door with a locking handle and deadbolt. (*Id.* at 33–34, 40). Body camera footage shows that when officers reached that door, it was closed. Inside the door was a second-floor living area that, like the first-floor living area, was comprised of two bedrooms, a kitchen, a bathroom, and a living room. (*Id.* at 34–35). Thus, the first- and second-floor living areas appeared to be two separate units in a duplex. (*Id.* at 35; R. 20-3, PageID# 134, ¶ 30). Returning to the vestibule inside the rear exterior door, the door that led downstairs to the basement was closed. (Suppression Hr'g Tr. 18). It did not have locks on it. *Id.*

While executing the warrant, officers interviewed the occupants, who were identified as Defendant's family members. (*Id.* at 13–14; R. 20-3, PageID# 137, ¶ 32). Specifically, the second-floor occupants were Defendant's cousin and his cousin's mother. (*See* R. 20-3, PageID# 138, ¶ 36). Through these interviews, officers learned that the building's interior doors were open "most of the time," the residence was "free[ ]flowing" such that all occupants "c[ould] go to" the other floors, (Suppression Hr'g Tr. 14), and the occupants "defined [the residence] as an entire house," (*id.* at 49).

While on-site, Officer Anderson consulted with two Assistant U.S. Attorneys (AUSAs) about conducting the search. (*Id.* at 41). Officers "got guidance from" the AUSAs "and went off of what the warrant said and … stayed downstairs[,] …. st[i]ck[ing] to all the [AUSAs'] guidance … and what [they] saw in the house along with what the family told" them. (*Id.* at 17). Officers did not search the second floor "because it seemed clear from the warrant that [they] didn't have permission to search the upstairs apartment." (*Id.* at 41). The door in the vestibule at the top of the stairs to the basement was closed but not locked, and officers pushed it open and searched the basement. (*Id.* at 18). The basement was "the access to the laundry for the whole house." (*Id.* at 19). There, officers found "[t]wo firearms, pistols, multiple brick-shaped objects

4

of fentanyl, other drugs," "a cutting table," "some paper" officers "had been seeing going into prisons that was co[at]ed with narcotics, [and] a large quantity of drugs." (*Id.* at 24).

Later, Defendant arrived. *Id.* Officer Anderson *Mirandized* him, *id.*, and other officers interviewed him, (*see id.*; R. 20-3, PageID# 137, ¶ 34). During the interview, Defendant admitted to officers that he "had fentanyl and two firearms in the basement of the residence." (R. 20-3, PageID# 137, ¶ 34).

## II. Analysis

Defendant argues that his statements to law enforcement officers and the evidence seized from the basement must be suppressed because officers' search of the basement violated his Fourth Amendment right against unreasonable searches. (R. 20, PageID# 113–16). First, he argues that by searching the basement officers unreasonably exceeded the warrant's scope. *Id.* Second, he argues that the good-faith exception does not apply. (*Id.* at PageID# 115–16).

The Government argues that Defendant's statements and the evidence seized from the basement should not be suppressed because officers' search of the basement was constitutionally permissible. (R. 22, PageID# 151–57). It argues that officers reasonably believed that the basement was "part of the 'downstairs' of 4105 E. 64th Street." (*Id.* at PageID# 151–55; *see also* Suppression Hr'g Tr. 52–53). It further argues that even if the search exceeded the warrant's scope, the good-faith exception applies. (R. 22, PageID# 151, 153–54, 156–57).

**A. Scope of the Search Warrant**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV.[2]

---

[2] When asserting that a search violated the Fourth Amendment, a defendant "challenging the admission of evidence" must first show that he had "a legitimate expectation of privacy in the place searched or the

With some exceptions, generally, for a search to be reasonable, it must be conducted pursuant to a valid search warrant. *See Johnson v. United States*, 333 U.S. 10, 13–15 (1948). Among other requirements, the Fourth Amendment mandates that warrants "particularly describ[e] the place to be searched." *United States v. Blakeney*, 942 F.2d 1001, 1026 (6th Cir. 1991) (alteration in original) (quoting U.S. Const. amend. IV). This particularity requirement prohibits general searches. *Marron v. United States*, 275 U.S. 192, 196 (1927); *see also United States v. Dawkins*, 83 F. App'x 48, 51 (6th Cir. 2003) (citing *Marron*, 275 U.S. at 196).

A search pursuant to a valid warrant can become an invalid general search if the officers conducting the search flagrantly disregard the search warrant's limitations. *United States v. Garcia*, 496 F.3d 495, 507 (6th Cir. 2007) (quoting *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985)). Officers flagrantly disregard a warrant's limitations only when they "'exceed[] the scope of the warrant *in the places searched*' (rather than the items seized)." *Id.* (quoting *Waller v. Georgia*, 467 U.S. 39, 43 n.3 (1984)). "The test for determining if the officers engaged in an impermissible general search is whether their search *unreasonably* exceeded the scope of the warrant." *Id.* (citing *Brindley v. Best*, 192 F.3d 525, 531 (6th Cir. 1999)). "Violations of the Fourth Amendment—including th[e] particularity requirement—may result in suppression of

---

thing seized." *United States v. King*, 227 F.3d 732, 743 (6th Cir. 2000) (citing *Katz v. United States*, 389 U.S. 347, 353 (1967); *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990); *United States v. Kincaide*, 145 F.3d 771, 779 (6th Cir. 1998)). Courts conduct a two-part inquiry when evaluating the existence of a legitimate expectation of privacy, asking whether: (1) the defendant's conduct exhibits an actual expectation of privacy and (2) the expectation of privacy "is one that society is prepared to recognize as reasonable." *Id.* at 743–44 (quoting *Bond v. United States*, 529 U.S. 334, 338 (2000)). Here, the Government does not challenge whether Defendant had a legitimate expectation of privacy in the basement of the residence at issue. (*See* R. 22). Moreover, following *King*, "Defendant exhibited an actual subjective expectation of privacy in the basement by hiding" firearms, drugs, and drug paraphernalia there, and Defendant had an expectation of privacy that society would recognize as reasonable in the residence's shared basement. *See id.* at 744–50 (citing *Bond*, 529 U.S. at 338; *United States v. Bailey*, 628 F.2d 938, 943–44 (6th Cir. 1980); *United States v. Taborda*, 635 F.2d 131, 137 (2d Cir. 1980)).

6

tainted evidence under the exclusionary rule." *United States v. Demasi*, 715 F. Supp. 3d 1009, 1016 (E.D. Mich. 2024) (citing *United States v. Galaviz*, 645 F.3d 347, 354 (6th Cir. 2011)).

Here, officers had a search warrant, the validity of which Defendant does not contest. (*See* R. 20). Nevertheless, Defendant argues that evidence seized from the basement should be suppressed. (*Id.* at PageID# 113–15). He argues that because officers searched the shared basement when the search warrant was limited to "4105 E. 64th Street, Downstairs," the search unreasonably exceeded the warrant's scope, violating his Fourth Amendment right against unreasonable searches. *Id.*

The Government argues that the basement was within the warrant's scope because it was "part of the 'downstairs.'" (R. 22, PageID# 153–56; Suppression Hr'g Tr.). It argues that "downstairs" included "the first floor and basement." (Suppression Hr'g Tr. 52–53). Defendant argues that "4105 E. 64th Street, Downstairs," included only the residence's first floor. (*See* R. 20, PageID# 115).

Officer Anderson applied for and received a warrant to search "4105 E. 64th Street, Downstairs," because this was how Defendant's driver's license and criminal history listed his address. (*See* Suppression Hr'g Tr. 7, 25; R. 20-2, PageID# 125, ¶ 19). Although the Affidavit and first attachment to the search warrant application described a two-story residence and noted that "[a]ccess to the lower unit" was "at the rear of the residence," it did not indicate and the hearing did not evidence that the "Downstairs" limited the scope to only the first floor or the basement. (R. 22-2, PageID# 159). The word "downstairs" can be used as a noun, adjective, and adverb. *Downstairs*, Merriam-Webster (last visited May 9, 2025), https://www.merriam-webster.com/dictionary/downstairs. As a noun, "downstairs" means "the lower floor of a building." *Id.* As an adjective, "downstairs" means "situated on the main, lower, or ground floor

7

of a building." *Id.* As an adverb, "downstairs" means "on or to a lower floor." *Id.* Given these definitions, "downstairs" could reasonably encompass not just the house's first floor but also any "lower floor," including a basement. Because the application identified the access point to the "4105…Downstairs" as the rear exterior door, officers could have reasonably concluded that "4105…Downstairs," and "the lower unit" included those portions of the two-story residence, within that exterior door and below the second floor. Officers did not search the second floor of the residential house, but limited their search to the terms of the warrant—downstairs—which officers reasonably determined encompassed the first floor and basement.

The Government argues that officers also acted reasonably because no interior markings denoted the building contained multiple units and there was no shared hallway, "physical barrier, separate entrance, or locked door" that separated the basement from the first-floor living area. (R. 22, PageID# 153–56). Despite the Government's contentions, physical barriers separated the first- and second-floor living areas—each had a separate entrance door with a locking handle and deadbolt—and the basement stairs were behind a separate door that could close but did not have any locking mechanism. (Suppression Hr'g Tr. 18, 30–31, 33–34, 40). The second-floor and basement doors were closed when officers executed the warrant. (*Id.* at 18, 33–34, 40).

The Government, however, is correct that inside the residence, no signs or markings denoted the first-floor living area and basement as separate units. (*Id.* at 14). In some circumstances, a lack of interior markings denoting a basement as separate from a residence's first-floor living area can be relevant to determining whether searching that basement is within the scope of a warrant to search a first-floor unit. *United States v. Bogel*, No. 3:19cr137(1), 2021 WL 1720893, at *1, 4–6 (S.D. Ohio Apr. 30, 2021), *aff'd*, 2023 WL 110722 (6th Cir. Jan. 5, 2023). Here, as explained above, the search warrant application noted that the access to

8

"Property to Be Searched" was from the exterior rear door, (R. 22-2, PageID# 159), which could reasonably be understood to indicate that "4105 E. 64th Street, Downstairs," included all parts of the residence below the second floor after entering the rear exterior door. The basement door was right next to the first-floor living area door such that the doors' frames connected. (*See* R. 22-6). Although it is highly instructive, the *King* decision on which Defendant relies is factually distinguishable. The proximity between the basement and first-floor living area here was far closer than in *King*, where the Sixth Circuit held that officers unreasonably exceeded the scope of a warrant to search the "downstairs unit in a two-family, two and one half story…dwelling" by exiting the downstairs unit, going down a common hallway, and opening an unlocked door to search the duplex's shared basement. 227 F.3d at 748, 750–53. In addition, the search warrant in *King* was limited to the "downstairs unit," *id.*, which is akin to the first-floor unit and narrower than the language here referring generally to the residence's "downstairs." Thus, here, without interior markings denoting separation between the first-floor and the basement, officers could have reasonably interpreted the areas' high degree of proximity as indicating that the basement and first-floor living area were connected and, at minimum, part of the building's "downstairs." Occupants normally leaving the first-floor living area's door open and indicating that they considered the residence as the entire house when officers executed the warrant, bolsters this understanding. (Suppression Hr'g Tr. 14, 30–31, 33–34, 49).

Thus, under the circumstances presented here, the Court does not find that officers unreasonably exceeded the scope of the warrant. *Bogel*, 2021 WL 1720893, at *5. Because searching the basement did not unreasonably exceed the warrant's scope, officers did not flagrantly disregard its limitations. *See Garcia*, 496 F.3d at 507. Defendant's motion to suppress the evidence seized from the basement and his subsequent statements admitting, after being

9

*Mirandized*, that the firearms and drugs seized were his is denied.

**B. Good-Faith Exception**

Even if a search exceeds a warrant's scope, the exclusionary rule should not be applied to suppress evidence when officers "act with an objectively 'reasonable good-faith belief' that their conduct is lawful." *Davis v. United States*, 564 U.S. 229, 238 (2011) (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). The good-faith exception does not apply:

> (1) if the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) if the issuing magistrate failed to act in a neutral and detached fashion and merely served as a rubber stamp for the police; (3) if the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or where the warrant application was supported by nothing more than a bare bones affidavit; and (4) if the warrant was facially deficient in that it failed to particularize the place to be searched or the things to be seized.

*King*, 227 F.3d at 753 (citing *Leon*, 468 U.S. at 914–15).

Defendant argues that searching the basement was not reasonable and the good-faith exception should not apply. (R. 20, PageID# 115–16). The Government argues that the good-faith exception applies because "the living space and adjoining basement appeared to be part of a single unit." (R. 22, PageID# 156–57). The Government contends that the downstairs living area and basement "were not marked in any way to differentiate them as separate spaces," and "there was no physical barrier, separate entrance, or locked door to separate the upstairs or downstairs portions of the residence[] or the downstairs portion from the basement." (*Id.* at PageID# 156). Although there were doors separating the first- and second-floor living areas and basement, (Suppression Hr'g Tr. 18, 30–31, 33–34, 40), there were no markings denoting that the basement and first-floor living area were separate, (*id.* at 14). The doors to the first-floor living area and basement were directly next to each other. (R. 22-6). The basement door did not lock, and the

first-floor living area door was open when officers executed the warrant. (Suppression Hr'g Tr. 18, 30–31, 33–34). As explained above, the warrant authorized search of the house's "downstairs," which could reasonably be interpreted as encompassing the basement. Thus, in this case, officers' conclusion that the "downstairs" included the basement was not unreasonable.

Moreover, officers believed Defendant was living at the two-story residential home with his parents. (R. 22-3, PageID# 167). Further, unlike in *King*, where officers did not know until the suppression hearing that the duplex's occupants lived in separate units but treated it as a single home, here, officers learned that the occupants considered the two-story residence a single house while conducting a protective sweep, (Suppression Hr'g Tr. at 14, 49). *Compare King*, 227 F.3d at 752, 754. The Court finds that officers had an objectively reasonable belief that the basement was considered by occupants part of a single unit with the first-floor living area or that the warrant's scope otherwise encompassed the basement. *See Bogle*, 2021 WL 1720893, at *6. Therefore, officers had an objectively reasonable good-faith belief that searching the basement was authorized by the search warrant and lawful.[3] Even if the Court were to conclude that searching the basement exceeded the warrant's scope, the good-faith exception would apply to excuse any error. *Id.* Defendant's motion to suppress is denied.

---

[3] Officer Anderson also testified that officers searched the basement only after consulting with two AUSAs regarding the warrant's scope. (*Id.* at 17–18, 41). Merely consulting the AUSAs is not sufficient to support the good-faith exception, *see United States v. Muse*, 729 F. Supp. 2d 905, 913 (E.D. Mich. 2010). The record, however, provides sufficient grounds to conclude that officers acted with an objectively reasonable good-faith belief that their conduct was within the warrant's scope and lawful.

### III. Conclusion

For the foregoing reasons, Defendant's Motion to Suppress, (R. 20), is DENIED.

IT IS SO ORDERED.

s/ <i>David A. Ruiz</i><br>
David A. Ruiz<br>
United States District Judge

Date: May 12, 2025